BARRY M. SABIN
Acting United States Attorney
Counterterrorism Section

MICHAEL P. SULLIVAN
Special Assistant United States Attorney
MICHAEL D. TAXAY
Trial Attorney
United States Department of Justice
Counterterrorism Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 353-3125

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR-04-127-C-RCT |
| | ) | |
| | ) | GOVERNMENT'S RESPONSE TO |
| Plaintiff, | ) | DEFENDANT'S MOTION TO |
| vs. | ) | SUPPRESS EVIDENCE OF |
| | ) | DEFENDANT'S ALLEGED |
| DAVID ROLAND HINKSON, | ) | CONFESSION (and Request |
| Defendant. | ) | for Evidentiary Hearing) |
| | ) | |

COMES NOW the United States of America, by and through its undersigned attorneys and respectfully files this opposition to defendant David Roland Hinkson's motion to suppress evidence of his confession (Motion), pursuant to the Fifth and Sixth Amendments to the United States Constitution, based on the words "I can't call my lawyer?" uttered by Defendant while in the midst of being arrested. At the time, Defendant was not arguing with the instructions of a law enforcement officer, who was properly and solely focused on securing Defendant and

79

completing the arrest safely.

Defendant's motion should be denied. He had not yet been charged with the offenses being investigated, and so his Sixth Amendment right to counsel had not yet attached. Moreover, Defendant's reference to counsel occurred prior to custodial interrogation, and one cannot invoke the Fifth Amendment right against self-incrimination anticipatorily. Indeed, under the circumstances, Defendant's reference to counsel was ambiguous. However, his subsequent initiation of a conversation about the investigation, after clear *Miranda* warnings, both clarified his earlier comment and cancelled the prophylactic requirement of *Edwards* barring interrogation. In light of Defendant's background, experience, and conduct, his decision to speak with law enforcement constituted a knowing, willing, and voluntary waiver of his Fifth Amendment right against self-incrimination. In sum, the facts as alleged by Defendant, even if true, would not justify suppression of his statement to law enforcement on April 4, 2003. Accordingly, there is no cause to hold an evidentiary hearing.

## BACKGROUND

A federal grand jury in the District of Idaho indicted Defendant in case No. CR-02-142-BLW for tax evasion and misbranding commercial products ("the Tax case"). After Defendant was arrested for those offenses in November 2002, he was free on bond until April 4, 2003, when he was arrested again pursuant to a warrant issued by the Magistrate Judge in the District of Idaho for alleged violation of the terms and conditions of his bond. The order revoking bond was based on evidence that Defendant had solicited the murders of three federal officials, U.S. District Judge Edward Lodge, Assistant U.S. Attorney (AUSA) Nancy Cook, and IRS Special

Agent (S/A) Steve Hines.

On April 4, 2003, Defendant was called to meet with Officer Skott Mealer of the Idaho

County Sheriff's Office at the Kooskia Sheriff's Substation.  The ostensible purpose of this

meeting was to discuss Defendant's allegations that a former employee, Mariana Raff, had

robbed him of several thousand dollars.  The primary motivation for the meeting, however, was

to facilitate Defendant's arrest at the police station, and thereby avoid a potentially dangerous

altercation at Defendant's house.  *See* Supplemental Report of Arrest (Exhibit 1 hereto).  The

government had good reason to be concerned about violence, given the tip that Defendant had

solicited murders of three federal officials, and knowledge that Defendant owned firearms.  *See*

Testimony of Special Agent (S/A) William Long at April 9, 2004 detention hearing (DH), at 4-

12, 17-19;[1] Motion, at 5 n.5.

After Officer Mealer spoke with Defendant about the alleged robbery, Officer Mealer

introduced Defendant to S/A Long of the Federal Bureau of Investigation.  According to

Defendant, his conversation with S/A Long was as follows:

| | |
|---|---|
| LONG: | Dave, what I have for you is a warrant for your arrest. |
| HINKSON: | Why? |
| LONG: | The warrant is [sic] the judge signed an order to revoke your pretrial release. |
| HINKSON: | Why? |

---

[1] S/A Long's testimony is attached as Exhibit 1 to the Government's Response to
Defendant's Motion to Dismiss On the Basis of Preindictment Delay and Pretrial Delay In
Violation of Fifth and Sixth Amendments and Fed. R. Crim. P. 48(b), filed herewith.

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE OF DEFENDANT'S ALLEGED CONFESSION
Page 3 of 22

LONG:       I'm going to explain that to you, okay?

HINKSON:    Inaudible.

LONG:       Before I do that, okay, since you're under arrest at this time, do you have
            any weapons on you or anything like that?

HINKSON:    No.

LONG:       Okay, go ahead and stand up.

HINKSON:    Can I make my phone call?

LONG:       Not right now.  Stand up.  Stand up.

HINKSON:    I really don't want to go with you right now.  It's
            Friday night.

LONG:       Well, it's really not negotiable.  Put your hands
            behind your head.  I'm just going to pay you down
            for any weapons.

HINKSON:    I can't call my lawyer?

LONG:       Not right now you can't.

HINKSON:    How come?  That's just my tape recorder.

MEALER:     It's on.  Do you want me to leave it on?

LONG:       You can turn it off.

MEALER:     Okay.  Turn off the time – or the tape.  It's 3:28.

Motion, at 6-7.  The defendant concedes that these statements, made in the midst of the arrest,

were the only reference he made to an attorney.  *See* Motion, at 14.

        After arresting Defendant and conducting a search incident to arrest, S/A Long read

Defendant his *Miranda* warnings verbatim from the standard FBI form.  *See* DH, at 26.

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE OF DEFENDANT'S ALLEGED CONFESSION
Page 4 of 22

Defendant indicated verbally that he understood the *Miranda* warnings. *See Id.;* FD-302
Summarizing April 4, 2003, Interview of David R. Hinkson (FD-302), at 1 (copy attached hereto
as Exhibit 2); DH, at 26. Before S/A Long had asked Defendant any questions about the
investigation, Defendant immediately initiated the conversation, discussing how Defendant
believed he had been set up by Raff. *See* Supplemental Report of Arrest, at 1; *see also* FD-302,
at 1; DH, at 26. Defendant then proceeded to discuss with S/A Long other aspects of the
investigation, but they did not discuss the substance of Defendant's Tax case. *See* FD-302, at
1.DH, at 26; FD-302; Supplemental Report of Arrest.

A detention hearing was held on April 9, 2004, on the alleged violation of Defendant's
pretrial release, after which the Magistrate Judge issued an order revoking Defendant's bond. He
has remained incarcerated since.

On June 22, 2004, a federal grand jury in the District of Idaho indicted Defendant for his
threats against the three federal officials and their families (the Threats case). A superceding
indictment was returned thereafter, charging Defendant with nine counts of soliciting the murder
of a federal official (Counts I through IX) and two counts of threatening to murder a family
member of a federal official on account of performance of official duties (Counts X and XI).

## ARGUMENT

### I.    Defendant's Statement Was Properly Obtained

#### A.    The Sixth Amendment Right to Counsel Had Not Yet Attached

The Sixth Amendment right to counsel does not attach until a prosecution is commenced,
that is "at or after the initiation of adversary judicial criminal proceedings – whether by way of

formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Gouveia*, 467 U.S. 180, 188 (1984) (internal quotations and citation omitted). At the time Defendant spoke with S/A Long on April 4, 2003, no charges had been filed or other adversary criminal judicial proceeding had been commenced against Defendant regarding his alleged threats to federal officials and their families. Accordingly, the Sixth Amendment right to counsel had not attached regarding those offenses.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The purpose of this right, and "hence the purpose of invoking it – is to 'protect the unaided layman at critical confrontations' with his 'expert adversary,' the government, *after* 'the adverse positions of government and defendant have solidified with respect to the particular alleged crime. *McNeil v. Wisconsin*, 501 U.S. 171, 177-78 (1991). "Once this right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective." *Id.* at 175. However, the right "is offense specific. It cannot be invoked once for all future prosecutions . . ." *Id.* For this reason, "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right to counsel had not yet attached, are of course, admissible at a trial of those offenses.'" *Id.* (citing *Main v. Moulton*, 474 U.S. 159, 180 (1985)).

In *Texas v. Cobb*, the Supreme Court considered a case where a home had been burglarized and two of its occupants reported missing. Defendant Cobb was initially indicted only for the burglary. While he was free on bond, authorities obtained a tip that Cobb had also murdered the missing people. Cobb was arrested, given *Miranda* warnings, and, after waiving

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE OF DEFENDANT'S ALLEGED CONFESSION
Page 6 of 22

his rights, confessed to the murders. The central issue was whether his interrogation violated the
Sixth Amendment right to counsel, given that Cobb had already been appointed counsel to
handle the burglary charge. Holding that Cobb's Sixth Amendment rights had not attached with
respect to the murders, the Supreme Court declined to "read into *McNeil's* offense-specific
definition an exception for crimes that are 'factually related' to a charged offense." *Id.* at 168.
"[I]t is critical to recognize that the Constitution does not negate society's interest in the ability of
police to talk to witnesses and suspects, even those who have been charged with other offenses."
*Id.* at 171-72. The court further guided that, "'where the same act or transaction constitutes a
violation of two distinct statutory provisions, the test to be applied to determine whether there are
two offenses or only one, is whether each provision requires proof of a fact which the other does
not.'" *Id.* at 173 (*quoting Blockburger v. United States*, 284 U.S. 299, 304 (1932)). The *Cobb*
Court then held that burglary and murder are not the same offense, and so the confession was not
obtained in violation of defendant's rights.

Applying *Cobb* to the instant action, it is clear that, for purposes of the Sixth
Amendment, the charges pending against defendant in the Tax case are the same offense as the
threats being investigated by S/A Long on April 4, 2003. To convict on those threats, the
government would have to prove facts not in issue in the Tax case: specifically, that Defendant
had solicited the murders of federal officials, and that he had made threats against their families
on account of the official's performance of official duties. Therefore, that Defendant had a
lawyer representing him in the Tax case did not operate to give Defendant a Sixth Amendment
right to counsel when he was approached by S/A Long about the alleged threats.

Defendant Hinkson quarrels much with S/A Long's testimony during the detention

hearing, when S/A Long did not recall that Defendant indicated in the midst of his arrest on April

4, 2003, that he "had a lawyer." *See, e.g.*, Motion, at 3-4, 8-11. As *McNeil* and *Cobb* make

clear, however, Defendant's Sixth Amendment right to counsel had not yet attached with respect

to the alleged threats, and so whether Defendant "had a lawyer" for other, charged offenses was

irrelevant to the situation before S/A Long. In the midst of Defendant's arrest, S/A Long was

focused solely on completing securing a potentially dangerous situation. Moreover, S/A Long

testified accurately when asked whether Defendant had indicated a desire to have counsel present

during custodial interrogation, responding that Defendant understood his Miranda rights and

immediately started talking. *See* DH, at 26.

In sum, Defendant's Sixth Amendment right to counsel had not yet attached when S/A

Long spoke with Defendant on April 4, 2003.

**B.     The Fifth Amendment Right Against Self Incrimination
        Cannot Be Invoked Anticipatorily In the Midst of an Arrest**

Defendant further contends that his Fifth Amendment right against self-incrimination was

infringed, and that when he made his reference to counsel S/A Long should have stopped asking

questions and not even given *Miranda* warnings. Memorandum in Support of Motion, at 3-5.

This position reflects a fundamental misunderstanding of the limited right to counsel afforded by

the Fifth Amendment, which cannot be invoked prior to custodial interrogation. If adopted,

Defendant's extreme position would grossly hinder proper law enforcement activities and,

ironically, unconstitutionally limit the very protections afforded by *Miranda*.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." This requires that custodial interrogation be preceded by advice of the rights to remain silent and to the presence of an attorney. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If counsel is requested, "the interrogation must cease until an attorney is present." *Id.* At 474. To this rule, the Supreme Court added in *Edwards v. Arizona* the prophylactic requirement that, when the accused has validly invoked his right to have counsel present during custodial interrogation, subsequent waiver by the accused of his Fifth Amendment right cannot be established by showing that the accused responded to further police-initiated custodial interrogation. 451 U.S. 477, 484-85 (1981).

The right to counsel guaranteed by the Fifth Amendment is limited, however, and cannot be invoked in advance of the circumstance that it protects against, specifically, custodial interrogation. In *McNeil*, the Supreme Court found there be no constitutional violation with respect to defendant's confession of a burglary and murder in Caledonia, Wisconsin. At the time this confession was given, defendant McNeil had already been charged and was represented by counsel in connection with a separate burglary in West Allis, Wisconsin. In reaching its decision, the Supreme Court reiterated that *Edwards* "applies only when the suspect has expressed his wish for the particular sort of lawyerly assistance that is the subject of Miranda. It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*." *Id.* at 178 (citations and quotations omitted) (emphasis in original). The Supreme Court further explained in dicta the limited nature of *Miranda/Edwards*:

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE OF DEFENDANT'S ALLEGED CONFESSION
Page 9 of 22

> We have never held that a person can invoke his Miranda rights
> anticipatorily, in a context other than custodial interrogation . . . .
> Most rights must be asserted when the government seeks to take
> action they protect against. The fact that we have allowed the
> Miranda right to counsel, once asserted to be effective with respect
> to future custodial interrogation does not necessarily mean that we
> will allow it to be asserted initially outside the context of custodial
> interrogation, with similar future effect.

*Id.* at 182 n.3.

This guidance was embraced by the Ninth Circuit in *United States v. Wright*, when it held

that "Miranda rights may not be invoked in advance outside the custodial context." 962 F.2d

953, 955 (9th Cir. 1992). During defendant Wright's guilty plea on a separate offense, his

counsel requested to be to be present at future interrogations of defendant. Rejecting counsel's

assertion that this request had invoked Wright's Fifth Amendment right to counsel, the Ninth

Circuit held that Wright's subsequent statements to police, made without counsel present, were

not obtained in violation of *Miranda/Edwards. See Id.* at 956.

A request for *Miranda* counsel is not therefore effective if made while a person is in

custody but before interrogation. Indeed, it is axiomatic that "[a] request for *Miranda* counsel

must be made within "the context of custodial interrogation" and no sooner." *Alston v. Redman*,

34 F.3d 1237, 1246 (3rd Cir. 1994). The antipathy towards anticipatory invocation of *Miranda*

rights is consistent with *Miranda's* underlying principles. *See Id.* at 1246. The *Miranda* right to

counsel is a prophylactic rule that does not operate independent form the danger it seeks to

protect against – "the compelling atmosphere inherent in the process of in-custody interrogation"

– and the effect that danger can have on a suspect's privilege to avoid compelled self-

incrimination. *See Id. (citing Miranda,* 384 U.S. at 478). To allow an individual to interpose

*Miranda* in a situation outside the custodial interrogation would represent an unwarranted

extension of *Miranda's* procedural safeguards. *See Id. (citing Davis v. United States,* 512 U.S.

452 (1994) (declining "to extend *Edwards* and require law enforcement officers to cease

questioning immediately upon the making of an ambiguous or equivocal reference to an

attorney")). "It is clear . . . that the special procedural safeguards outlined in *Miranda* are

required not where a suspect is simply taken into custody, but rather where a suspect in custody

is subject to interrogation." *Rhode Island v. Innis,* 446 U.S. 291, 300 (1980).

In *United States v. Doe,* the Ninth Circuit considered a case where defendant, a juvenile,

had been arrested and placed in a holding cell. 170 F.3d 1162, 1166 (9th Cir.), *cert. denied,* 528

U.S. 978 (1999). An hour and a half later, a U.S. Customs agent introduced himself to

defendant, noting that a large quantity of narcotics had been recovered from the van defendant

had been driving. Before the Customs agent could begin to explain the booking process or to

interrogate defendant, the defendant asked the agent, "What time will I see a lawyer?" The agent

responded that defendant could see a lawyer within two days if the State prosecuted him and one

day if the federal government prosecuted him. A few hours later, after being Mirandized,

defendant confessed. The Ninth Circuit held that defendant's motion to suppress this confession

was properly denied, because defendant had not invoked his right to have counsel present during

interrogation. *Id.* at 1166. The Ninth Circuit highlighted that defendant had "questioned [the

Custom's agent] about an attorney before being read his *Miranda* rights, before being

interrogated and even before biographical questioning began." *Id.* Consequently, the court

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE OF DEFENDANT'S ALLEGED CONFESSION
Page 11 of 22

considered defendant's question, "What time will I see a lawyer" to be "an inquiry regarding the time at which appointed counsel would be made available." *Id.*

As in *Doe*, defendant Hinkson's reference to counsel was made while he was being arrested, before custody had been secured, before Hinkson had been Mirandized, and before any interrogation had begun. Thus, whatever his statement, it was made too early to trigger Fifth Amendment protections. *See States v. Bautista*, 145 F.3d 1140, 1147 (10th Cir.), *cert. denied*, 525 U.S. 911 (1998) ("[A] custodial situation and official interrogations are required in order to implicate the *Miranda Edwards* right to counsel prophylaxis.").

Defendant's asserts that after he made his reference to counsel, S/A Long "was required to cease questioning [him]." *See* Memorandum in Support of Motion, at 3-4. This contention is premised on a misreading of four Ninth Circuit decisions, all of which involve custodial interrogations where defendant had sought to invoke his right to counsel *after* having been read the *Miranda* warnings. *See Robinson v. Borg*, 918 F.2d 1387, 1389 (9th Cir. 1990), *cert. denied*, 502 U.S. 868 (1991) (Miranda warnings given); *see also Smith v. Endell*, 860 F.3d 1528, 1529 (9th Cir. 1988), *cert. denied*, 498 U.S. 981 (1990) (same); *Alvarez v. Gomez*, 185 F.3d 995, 996-97 (9th Cir. 1999) (same); *United States v. Jara*, 973 F.2d 746, 751-752 (9th Cir. 1992) (noting that after defendant was uncuffed, he requested counsel but "interrogation continued"). Accordingly, these cases are inapposite, because defendant Hinkson made his reference to counsel in the midst of arrest, before custodial interrogation and before receiving *Miranda* warnings.

Defendant's position that his reference to counsel occurred while he was being

interrogated is also incorrect factually.  According to Defendant's own transcript, the only

question that S/A Long had asked Defendant prior to Defendant's reference to counsel was

whether Defendant was carrying a weapon.  The notion that S/A Long should stop such

questioning while trying to secure a potentially dangerous situation stretches beyond

comprehension the protections actually afforded by *Miranda*.  Furthermore, Defendant's

contention that S/A Long should not have warned him of his *Miranda* rights – the very rights that

he now says were violated -- runs directly counter to *Miranda* and its voluminous progeny, which

clearly require law enforcement officers to notify a person of their *Miranda* rights in the context

of a custodial interrogation.  *See* Memorandum in Support of Motion, at 4-5 ("Agent Long never

should have Mirandized him . . . "),

S/A. Long acted properly, and Defendant's premature reference to counsel was

ineffective to invoke Fifth Amendment protections.

## C.    Defendant's Reference To Counsel Was Ambiguous

A statement is sufficient to invoke the right to counsel only if a reasonable police officer

would perceive the statement to be a request for counsel.  *See Davis*, 512 U.S. at 459.  Courts

agree that a statement concerning an attorney made before interrogation begins is far less likely

to be a request for attorney assistance during interrogation than a similar statement made during

custodial interrogation.  *Doe*, 170 F.3d at 1166; *see also Grant-Chase v. Commissioner, New

Hampshire Dep't of Corrections*, 145 F.3d 431, 436 n.5 (1st Cir.), *cert. denied*, 525 U.S. 941,

119 S. Ct. 361, 142 L. Ed.2d 298 (1998); *United States v. Scurlock*, 52 F.3d 531, 537 (5th Cir.

1995) (defendant's pre-interrogation request for an attorney "could reasonably be understood to

be a recognition by the defendant of her need for an attorney in the future . . ."); *Williams v. Larson*, 2003 WL 1785807 (N.D. Cal.) ("A statement concerning an attorney made before interrogation begins is far less likely to be a request for attorney assistance during interrogation than a similar statement made during custodial interrogation"). Where the desire to invoke the Fifth Amendment right to counsel is unclear, the Ninth Circuit has held that there may be further questioning to clarify the defendant's intention, *United States v. Fouche*, 776 F.2d 1398, 1405 (9th Cir. 1985). "If clarification reveals that the suspect does not want counsel, the interrogation may continue." *Id.*

Assuming *arguendo* that defendant Hinkson's reference to counsel was sufficiently timely to invoke a Fifth Amendment right to counsel, the reference was at ambiguous and more than anything suggested that Defendant wanted legal assistance to avoid being arrested, not to help him in a custodial interrogation. A careful parsing of the colloquy between Hinkson and S/A Long makes this clear. Immediately upon being introduced to Defendant by Officer Mealer, S/A Long told Defendant that he had a warrant for his arrest. S/A Long then asked Defendant whether he was carrying any weapons, to which Defendant answered no. S/A Long then instructed Defendant to "stand up." Defendant failed to comply, however, instead stating "Can I make my phone call?"[2] S/A Long's response "not right now," was entirely appropriate, as the job at hand was to secure defendant peaceably. S/A Long then repeated his instruction, twice: "Stand up. Stand up." This time rising, Defendant again argued with S/A Long, "I don't really want to go with you right now. It's Friday night." To this S/A Long replied, "Well, it's not

---

[2]   Notably, Defendant did not specify who he wanted to call.

really negotiable. Put your hands behind your head. I'm just going to pat you down." Rather

than comply, again Defendant argued with S/A Long, saying "I can't call my lawyer?" S/A Long

then replied "not right now you can't." This exchange shows that Defendant simply did not want

to be arrested and, given the presumption of *Doe, Grant-Chase, Scurlock,* and *Williams,*

Defendant's lone reference to counsel cannot reasonably be construed as a request for such

assistance in a custodial interrogation.

To the extent S/A Long continued to question Defendant after he made reference to

counsel, the questions were limited to the *Miranda* warnings, which would work to clarify any

prior ambiguous request. *Cf. McNeil,* 501 U.S. at 180 ("If a suspect does not wish to

communicate with the police except through an attorney, he can simply tell them that when they

give him the *Miranda* warnings."). Through the *Miranda* questions, and Defendant's reaction,

any ambiguity as to whether Defendant wanted to have counsel present during custodial

interrogation was removed. Defendant wanted to talk.

D.    **Defendant's Waived his *Miranda* Rights**

Defendant knowingly, intelligently, and voluntarily waived his Fifth Amendment rights

when he initiating the discussion with S/A Long after receiving his *Miranda* warnings. The

prophylactic rule of *Miranda/Edwards,* barring further interrogation once an accused has invoked

his Fifth Amendment right to counsel, is inapplicable "when the accused himself initiates further

communication." *Edwards,* 451 U.S. at 484-85.

This limitation was clarified by the Supreme Court in *Oregon v. Bradshaw.* In that case,

the defendant had initially invoked his Fifth Amendment right to counsel, but later reopened a

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR PROPER VENUE OR
ALTERNATIVELY, MOTION TO CHANGE VENUE
Page 15 of 22

dialogue with the police by asking "Well, what is going to happen to me now?" Id. at 1041-42.
The Supreme Court ruled that when the accused has "evinced a willingness and a desire for a
generalized discussion about the investigation," law enforcement agents may resume an
interrogation if there has been a valid waiver of Fifth Amendment protections. 462 U.S. 1039,
1045-47 (1983) (contrasting defendant's question with a "necessary inquiry arising out of the
incident of the custodial relationship"such as seeking a drink of water or to use a telephone).

As did defendant Bradshaw, defendant Hinkson initiated the conversation with law
enforcement. Before being asked any questions, Hinkson volunteered that he had been set up by
Raff. Though this exchange, Hinkson expressed a clear desire to speak about the investigation.
For this reason, even had Defendant previously invoked a Fifth Amendment right to counsel,
from that point on, the prophylactic rule of *Miranda/Edwards* was inapplicable.[3]

Hinkson voluntarily, knowingly, and intelligently waived his Fifth Amendment rights. A
waiver is voluntary if made as a free and deliberate choice, without intimidation, coercion, or
deception. *See Shedelbower*, 885 F.2d at 574-575; *see also United States v. Velasquez*, 885 F.2d
1076, 1087-1088 (3d Cir. 1989) (waiver was voluntary; suspect had only briefly been in custody,
was not ill-treated, and no threats or promises had been made). Indeed, there is no allegation that
Hinkson was threatened or promised anything before he initiated his conversation with S/A
Long. Knowing and intelligent waivers occur where the suspect had been advised of his rights,

---

[3] The Ninth Circuit has held that remarks by law enforcement following invocation of the
right to counsel do not "initiate" an interrogation if they do not call for an incriminating response
and were not an invitation to discuss the matter. *See Shedelbower v. Estelle*, 885 F.2d 570, 572-
574 (9th Cir. 1989) (officer's statements that suspect's friend was in custody and that the suspect
had been identified by the victim did not initiate interrogation).

understood his rights, and not been threatened or induced to talk. *See Bradshaw*, 462 U.S. at
1046-1047 (recognizing that a suspect can change his mind about wanting an attorney). In
*United States v. Glasgow*, the Ninth Circuit found there to be valid waiver where the suspect had
a criminal record, and thus familiarity with police practices, and no apparent difficulty
understanding the questions. *See Glasgow*, 451 F.2d 557, 558 (9th Cir. 1971).

As with *Glasgow*, Hinkson was familiar with police practices because of his criminal
record. Similar to *Bradshaw*, Hinkson had not been threatened or induced to talk. Hinkson had
been given his *Miranda* warnings, he verbally acknowledged that he understood them, and he
expressed no difficulty comprehending them. It is therefore clear that Hinkson's waiver of his
Fifth Amendment rights was valid.

Defendant's assertion that he felt intimidated by S/A Long, and therefore was incapable
of resisting interrogation, is unsupported by any evidence other than Defendant's self-serving
assertions, and it belies the reality of both his prior arrest and his discussion with S/A Long on
April 4, 2003. Even taking the essential facts of Defendant's recitation of his prior arrest as true
– that, after Defendant had failed to respond to bullhorn calls, a team of law enforcement officers
stormed Defendant's house and, finding him lying next to a loaded weapon, handcuffed
Defendant, hurriedly caused him to get dressed, and then shoved him into the back seat of a car –
there is nothing about the arrest that is extraordinary or that reasonably would cause one to be
intimidated months later when meeting a member of that arresting team. *See* Memorandum in

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR PROPER VENUE OR
ALTERNATIVELY, MOTION TO CHANGE VENUE
Page 17 of 22

Support, at 5.[4]  Indeed, Defendant's conduct on April 4, 2003, was anything but that of the

cowered witness that his counsel now paints him to be.  Much to the contrary, as discussed

above, when confronted by S/A Long, Defendant was argumentative and he resisted instructions.

     In sum, Defendant knowingly, intelligently, and voluntarily waived rights under the Fifth

Amendment to remain silent and to have the assistance of counsel during custodial interrogation.

## II.     There Has Been No Spoilation Of Evidence

     Finally, Defendant argues that by turning off his tape recorder, the Government

improperly prevented him from presenting a complete defense in violation of the Due Process

clause or the Confrontation Clause of the Sixth Amendment, and that this act of turning off the

tape recorder somehow destroyed evidence.  These assertions grossly overstate Defendant's

rights, as the decision to turn off the tape recorder was entirely proper and consistent with FBI

procedure, which requires FBI agents not to tape interviews without special consent from the

Special Agent in Charge of their field office.  Defendant also fails to recognize that, in fact, no

evidence was destroyed.  Rather, Defendant's tape was preserved, which is why he could cite it at

length in his Motion.  Finally, it is worth noting that nowhere on the tape did Defendant request

that the tape recorder not be turned off.

     The untenable nature of Defendant's position is highlighted by the title of Section III of

his brief, which is "Spoilation of Opportunity To Obtain Evidence . . ."  Memorandum in Support

---

    [4]  The assertions of Defense counsel that the law enforcement agents maliciously
damaged Defendant's property and urinated in Defendant's bathtub are made without reference
to any record or evidence.  These unverified contentions are untrue, and absent *any* supporting
evidence their bald assertion does not merit an evidentiary hearing.

of Motion, at 6. In fact, there is no such concept in law. To the contrary, according to the very cases cited by Defendant, the Government is under no duty to obtain evidence. The Ninth Circuit clearly articulated this principle in *Miller v. Vasquez*, 868 F.2d 1116 (9th Cir. 1989), where it stated as follows:

> We are not persuaded by Miller's argument that *Trombetta* imposes upon police a duty to obtain evidence. The Supreme Court in *Trombetta* was confronted with a situation in which the police had obtained but failed to preserve breath samples. The Court held that the government may have a duty to *preserve* evidence after the evidence is gathered and in possession of the police. *Trombetta* did not impose a duty to obtain evidence. Thus, *Trombetta* does not control this case. Miller has not cited a case, nor have we found one, which holds that the due process clause is violated when the police fail to gather potentially exculpatory evidence. On the contrary, the cases we discovered hold to the contrary.

868 F.2d 1116, 1119 (9th Cir. 1989) (citations omitted). The *Miller* court further held that the Supreme Court's decision in *Arizona v. Youngblood*, 488 U.S. 51 (1988), which is also cited by Defendant, "makes clear, even failure to preserve evidence that is only *potentially* useful does not violate due process in the absence of bad faith on the part of the police." 868 F.2d at 1120.

Those decisions recognize that S/A Long had no duty to leave Defendant's tape recorder on to generate evidence. Moreover, because S/A Long did not know what Defendant would say in an interview, it cannot be said that he knowingly failed to preserve exculpatory evidence. Indeed, S/A Long cannot be said to have acted in bad faith when he was following the FBI's standard procedure not to tape interviews.

Defendant's reliance on the Due Process and Confrontation Clauses is off the mark, as the cases cited by Defendant bear no factual or legal nexus to the instant action. Two of the cases concern trial decisions to exclude existing evidence, *Crane v. Kentucky*, 476 U.S. 683, 685

(1986) (regarding how confession was obtained); *Mott v. Stewart,* 2002 WL 31017646 (D. Ariz.

2002) (regarding battered women syndrome); and two others concern an alleged interference with

defense counsel's ability to question witnesses, *United States v. Agostino,* 132 F.3d 1183 (7th Cir.

1997), *cert. denied,* 523 U.S. 1079 (1998) (government allegedly asked witness not to speak with

the defense); *United States v. Castillo,* 615 F.2d 878 (9th Cir. 1980) (government's deportation of

two aliens did not interfere with counsel's ability to interview them). Those situations are not

present here, and none of these cases involves the Government's destruction of, or failure to

create, evidence.

Defendant also cites *United States v. Canane,* which involved a situation where the police

did not allow a defendant to see his father immediately after the defendant was arrested for

driving while intoxicated (DWI). 622 F. Supp. 279 (W.D.N.C. 1985), *aff'd,* 795 F.2d 82 (4th Cir.

1986). The court's holding that the police improperly prohibited defendant's father from

observing defendant while in custody, which might have been helpful to rebut evidence of

defendant's alleged intoxication, is limited to the unique circumstances of DWI. *Id.* at 281-82.

Moreover, the *Canane* court based its holding on an accused's rights to be brought before a

Magistrate without undue delay and to communicate with friends and relatives. 622 F. Supp.

279, 280-81. None of those issues or interests are at issue in the instant action. In any event, as

discussed above, the Ninth Circuit has taught in *Miller* that the failure to preserve evidence that

is only *potentially* useful does not violate due process in the absence of bad faith. Once again,

S/A Long had good reason not tape the interview. He was following standard FBI procedure.

Consequently, there has been no violation of Defendant's rights under the Due Process or

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR PROPER VENUE OR
ALTERNATIVELY, MOTION TO CHANGE VENUE
Page 20 of  22

Confrontation clauses, nor has there been spoilation of evidence.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that the court deny,

without any hearing, the defendant's Motion to Suppress Evidence of Defendant's Alleged

Confession.

_Michael D. Taxay_

MICHAEL P. SULLIVAN
Special Assistant United States Attorney
MICHAEL D. TAXAY
Trial Attorney
United States Department of Justice
Counterterrorism Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 353-3125

## CERTIFICATE OF SERVICE

I certify that, on this ___ day of _____ 2004, I have served a true and correct copy of the forgoing GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OF DEFENDANT'S ALLEGED CONFESSION upon the persons named below by the method so indicated:

Wesley W. Hoyt
Attorney for Defendant
Bank One Building
333 West Hampden #500
Englewood, Colorado 80110

(X) U.S. Mail, 1st class postage paid
( ) Federal Express
( ) Hand Delivery
(X) Facsimile: 303-806-8881
(X) Facsimile: 208-926-7554

The Honorable Richard Tallman
United States Courthouse
1200 6th Avenue
21st Floor
Seattle, Washington 98101

( ) U.S. Mail, 1st class postage paid
(X) Federal Express
( ) Hand Delivery
(X) Facsimile: 206-553-6306

Kinko's Boise Downtown
Legal Copying Services Department
Fax Filing
691 South Capitol Boulevard
Boise, ID 83702

(X) Facsimile: 208-331-5150

Tene L. Lewis, Secretary

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR PROPER VENUE OR
ALTERNATIVELY, MOTION TO CHANGE VENUE
Page 22 of 22

# Exhibit 1



**SUPPLEMENTAL REPORT**: AGENCY ASSIST ARREST OF DAVID HINKSON

**DATE AND TIME:** APRIL 4TH 2003 AT APPROXIMATELY 3:30 P.M.

**LOCATION**: KOOSKIA SHERIFF'S SUBSTATION KOOSKIA, IDAHO

**SUSPECT**: HINKSON, DAVID R.

**OFFICERS**: LIEUTENANT SKOTT J. MEALER IDAHO COUNTY SHERIFF'S OFFICE AND SPECIAL AGENT WILLIAM LONG OF THE FEDERAL BUREAU OF INVESTIGATIONS F.B.I. COEUR D' ALENE, IDAHO

On the above date and time I assisted Agent William long of the F.B.I. in the arrest of David R. Hinkson. This arrest occurred in the Idaho County Sheriff's Office substation located on Main Street in Kooskia, Idaho.

At approximately 01:51 P.M. I placed a call to Hinkson's business approximately 6 miles south of Kooskia. The business name is Water Oz and the number I called was 208-926-4618. When I called the business I asked to speak with Hinkson and was transferred to him. During our conversation I asked to meet him at the Kooskia Sheriff's substation to discuss the Mariana Raff theft case. Ms. Raff had allegedly stolen $6,000.00 in cash from Hinkson's residence a few months earlier. After a brief conversation, Hinkson agreed to meet me and said he would be on his way shortly. I concluded the call at approximately 02:15 P.M.

Although I was actually conducting an investigation in this alleged theft from Hinkson, I used this meeting as a ruse to get Hinkson to come to the office so that Agent Long could make a Federal arrest on him. I had been involved in the previous arrest of Hinkson at his residence last fall. I am also aware of anti-law enforcement people who are sympathetic to Hinkson's current dealings with the Federal government and their violent statements towards Law Enforcement in general. By having him come to the office, I felt he would come alone and he could be arrested without incident or interference from these supporters.

At approximately 03:00 P.M. Hinkson had not arrived at my office and I placed another call to Water Oz. I was told that Hinkson had just left for Kooskia.

At approximately 03:15 I observed Hinkson driving a small car near the Kooskia substation. He parked it on the south side of the building. I recognized Hinkson as the driver and noticed him fumbling with something in the front passenger seat of his vehicle. As he exited the vehicle, I noticed he had papers in his hand. I watched Hinkson walk to the front of the Kooskia City Hall and enter the building.

A short time later he entered the Sheriff's Office and we exchanged greetings and introductions. Agent Long, Deputy Jason Mealer, and myself were present when Hinkson walked in. I invited Hinkson towards the back of the office and he began explaining his theory of what had happened to his missing money and why he felt Mariana Raff was the only one that could have taken the money. At that time, Deputy Jason Mealer completed his work and left the office.

Hinkson also told me about a credit card that he had at his residence and that it had been used without his permission in Lewiston. This card had been used to remove approximately $500.00 worth of cash. Hinkson felt that Raff was also the suspect in this theft and told me he had contacted the police in Lewiston. He indicated that they were working on getting the ATM video that was taken that day from that particular machine and were going to try to identify the person who used the card during the times of the withdrawals.

Hinkson explained how he had hired Raff to accompany him to Mexico to establish a business. He went through the particular statements tracking the money transfers that had been arraigned by Raff. As we were talking about this, Agent Long stood near us but off to the side. After we had discussed this information, I advised Hinkson that Agent Long wanted to talk with him. I told him I would follow up on the Raff case and ask her to submit to a polygraph test.

We walked to the back of the office and sat at a desk located towards the rear of the substation. Hinkson was sitting directly across from me. Agent Long approached Hinkson. As Agent Long did this he told Hinkson he was going to arrest him and take him to jail for violating his bond agreement. As Long approached, Hinkson he said, "Can I call my attorney?" Long said, "Not right now" and instructed him to stand. Hinkson looked at Long and started to get up. Hinkson said he didn't really want to go with him. Long stepped in and started searching Hinkson. As Long was searching Hinkson, he found a tape recorder in his front shirt pocket and removed it. As he pulled it out I noticed it was on and told agent Long. Long handed it to me and asked me to turn the tape off. I did.

At approximately 03:30 P.M. Agent Long read Hinkson his Miranda rights. Long told Hinkson he was going to be transported to Coeur D'Alene and they needed to get going. Hinkson asked why he was being arrested and taken there rather than Moscow. Agent Long explained that was where he was going to be taken to and it wasn't anything he had control over.

Hinkson became excited and started telling Long that he felt Raff had set him up and she was behind all of this. Long told him that she had spoken to the police about his trip to Mexico and that he was aware of a proposition between Raff, her brothers and Hinkson.

Hinkson said he had transferred approximately $86,000.00 to Citi Bank of Mexico to start a new business. Hinkson said the deal had gone bad and he had been in contact with the banks in Mexico and had recovered most all of what he had sent there except for approximately $32,000.00. Hinkson said he thought Raff, her brothers, an uncle and another unknown person were in on the theft and was concerned that he would not be able to recover the remaining amount. Hinkson said he was very upset and wanted to hurt the person who stole his money very badly. Raff volunteered to get the job done through her brothers and had told him it could be done for about $6,000.00.

Hinkson said he wanted to talk to them about doing that and she arraigned a meeting with them. Hinkson said they met at a "titty bar" and discussed killing the person that took his money. Hinkson told me this "titty bar" was one of the businesses he wanted to buy and convert into a Water Oz plant. This meeting took place in Pueblo, Mexico at what was actually a combination shopping mall and topless bar.

Agent Long told Hinkson he had another person tell him about an earlier conversation in which Hinkson had offered $10,000.00 to kill a judge, a federal prosecutor, and, an IRS agent. Hinkson said, "I knew that guy was a F.B.I. informant". Hinkson said the guy he suspected as the informant was named J.C. Agent Long told Hinkson he had a recording of this guy talking with Hinkson and they were discussing killing these people. Hinkson said that he was very mad at Agent Hines because he lied to a grand jury about being the leader of the local "Militia". Hinkson went on to say how mad he was about Nancy Cook falsifying documents regarding him and getting the charges from last November filed against his business. Hinkson said Judge Lodge was a failure and had been that way since he was appointed to the bench and had "never made an intelligent ruling". Hinkson said he thought Judge Lodge covered up for the F.B.I. during the Randy Weaver trial and dismissed the charges. Hinkson said "I haven't seriously said this or with any intent".

Hinkson said he had been approached by J.C. last week and told he could have anyone taken out for $10,000.00. Hinkson said he was mad enough to do it, but felt the court system would acquit him and he didn't need to do that. If not, he felt it was time not to be an American and he would leave the country. Hinkson said he did not tell J.C. he wanted anyone killed.

Hinkson said he did tell Raff he wanted to have her brothers "hurt" that guy in Mexico who took his money, but that conversation was in another country and we had nothing to do with that.

Long asked him what he remembered saying to J. C. Hinkson said he thought he might have said something like "I wish God would smite them". Hinkson thought he might have also said this in front of J.C.'s girlfriend, Ann Bates. Hinkson said he did say, "If someone was to kill them it would be worth $10,000.00 to me".

# Exhibit 2

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  **04/07/2003**

On 4-4-03 David R. Hinkson, DOB 7-18-56, was arrested by
SA William R. Long at the Idaho County Sheriff's Department
substation in Kooskia, Idaho.  The arrest occurred at approximately
3:30pm.  Present and participating in the arrest and subsequent
interview was Idaho County Deputy Sheriff Scott Mealer.  Hinkson
was arrested without incident.  Hinkson's person was searched
incident to arrest with no weapons or contraband found.  Hinkson
was found to be in possession of a small tape recorder which
appeared to be recording.  The recorder was removed from Hinkson's
shirt pocket and turned off by SA Long.  Hinkson was then
interviewed at the same location.  Hinkson was read his "Miranda"
warnings by SA Long from the standard form prior to interview.
Hinkson indicated that he understood the "Miranda" warnings and
began talking to the interviewers.  Hinkson was not handcuffed
during the interview.  Hinkson provided the following information:

Hinkson believed his employee, Mariana Raff, had stolen
money from him.  He sent $86,000 to Mexico via wire transfer for
the purpose of expanding his business operations in Mexico.  Raff
made the arrangements in Mexico to complete this transaction as she
speaks Spanish and Hinkson does not.  Hinkson found that he was
unable to access this money in Mexico.  Hinkson believed the money
had been stolen by the third party in Mexico with whom Raff worked
in conducting transactions there.  Hinkson has since recovered all
but $32,000.  This amount is still outstanding.  Hinkson told Raff
of his desire to hurt or kill the third party in Mexico who stole
his money.  Raff suggested that she could "get the job done" for
$6000 through her contacts in Mexico.  Hinkson then discovered
$6000 cash missing from his home.  He later realized that Raff had
stolen the $6000 as she would have known where it was in his home.
The amount of $6000 is roughly what she needed at that time for a
down payment on her new house.  Hinkson now believes that Raff was
responsible for the theft of the $86,000 and is responsible for the
outstanding amount of $32,000.  He fired Raff after the theft of
$6000 from his home.

Hinkson stated that he has been very angry and frustrated
since his arrest in November of 2002.  He stated that he has
"vented" in conversations with "J.C.", Annie Bates, Mariana Raff,
and others.  Hinkson has "vented" in conversations about Judge

Investigation on    4-4-03          at  Kooskia, Idaho

File #  266A-SU-57276

Date dictated    4-7-03

by    SA William R. Long

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

266A-SU-57276

Continuation of FD-302 of    David R. Hinkson _____, On 4-4-03 , Page 2

Lodge, Nancy Cook, Steve Hines, and Dennis Albers. Hinkson blames
Judge Lodge for wrongfully dismissing Hinkson's lawsuit against
Nancy Cook and Steve Hines. Hinkson believes that Judge Lodge has
never made a correct ruling during his career on the bench. As an
example, he cited the ruling to dismiss charges against the FBI
agent involved in the Vicki Weaver shooting.

Hinkson blames Assistant United States Attorney Nancy
Cook for forging the indictment against him. Hinkson believes that
there was no "certificate" of indictment which makes the indictment
fraudulent. Further, Hinkson believes that there was 12 Grand Jury
"tribunals" in which no indictment was issued, therefore the
indictment was forged by AUSA Cook. Also, there was more than a 70
day delay between the indictment and his arrest. Hinkson believes
this also renders the indictment invalid and forged by AUSA Cook.
He stated that AUSA Cook has a personal vendetta against him.

Hinkson blames IRS Agent Steve Hines for many of his
problems. Hinkson believes Hines has "stalked" him since 1997 for
the purpose of putting him out of business. Hinkson stated that
Hines perjured himself in Grand Jury proceedings. Hines lied about
Hinkson being the leader of two militia groups and illegally
dealing in machine guns. Hines improperly summarized testimony
from previous Grand Jury sessions.

Hinkson blames Grangeville, Idaho attorney Dennis Albers
for his legal problems also. Albers has sued him representing a
former Water Oz employee and has been involved in other litigation
pending against Hinkson.

Hinkson was asked directly if he ever offered money to
pay for the hurting or killing of Judge Lodge, AUSA Cook, SA Hines,
or Dennis Albers. Hinkson responded, "I never with intent said I
would pay to kill someone." Hinkson said several times that he
never "seriously" offered to pay to have someone killed or hurt.
Hinkson stated that he had never hired anyone to hurt anyone.

Hinkson did say to Raff "it would be really nice if
somebody hurt that guy" in reference to the person in Mexico who
stole his money.

Hinkson said that he never had a conversation with J.C.
about killing Judge Lodge, AUSA Cook, or SA Hines. Hinkson stated
he was sure that he did not remember if he had ever made a
statement about hurting SA Hines. Hinkson stated that he never