THOMAS E. MOSS
UNITED STATES ATTORNEY
WENDY J. OLSON
ASSISTANT UNITED STATES ATTORNEY
THOMAS BRADLEY
SPECIAL ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA, PLAZA IV, SUITE 600
800 PARK BOULEVARD
BOISE, IDAHO 83712-9903
TELEPHONE: (208) 334-1211

05 APR 18 ...

CLERK ...
IDAHO

BARRY M. SABIN
ACTING UNITED STATES ATTORNEY
MICHAEL P. SULLIVAN
SPECIAL ASSISTANT UNITED STATES ATTORNEY
MICHAEL D. TAXAY
TRIAL ATTORNEY
UNITED STATES DEPARTMENT OF JUSTICE
601 D STREET, NW
WASHINGTON, DC 2005
TELEPHONE: (202) 353-3116

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 02-142-C-BLW |
| Plaintiff, | ) | ~Case No. 04-127-C-BLW |
| | ) | |
| vs. | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| DAVID ROLAND HINKSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The United States of America respectfully files this memorandum addressing the issues

before the Court at the April 25, 2005, sentencing in this case and in response to the defendant's

1

"Sentencing Brief in Support of Objections and Corrections to Pre-Sentence Investigative Report," filed on April 1, 2005. This is a joint memorandum prepared by the prosecutors assigned to United States v. David Roland Hinkson, Cr. No. 02-142-S-RCT (the tax case), and by the prosecutors assigned to United States v. David Roland Hinkson, Cr. No. 04-127-S-RCT (the solicitation case).[1]

## PROCEDURAL BACKGROUND

On May 5, 2004, a federal jury sitting in Boise, Idaho, returned its verdict in the tax case, finding defendant David Roland Hinkson guilty on three counts of willful failure to file an income tax return, in violation of Title 26, United States Code, Section 7203, thirteen counts of willful failure to collect federal taxes, in violation of Title 26, United States Code, Section 7202, and ten counts of structuring financial transactions, in violation of Title 31, United States Code, Section 5324. On April 14, 2004, the defendant pled guilty to one count of delivering for introduction into interstate commerce a misbranded drug, and one count of delivering for introduction into interstate commerce an adulterated device, both violations of the Food, Drug and Cosmetic Act (FDCA). As part of the plea agreement the United States agreed to dismiss the remaining FDCA charges at sentencing.   Sentencing was set for July 27-28, 2004.

On June 22, 2004, a federal grand jury sitting in Boise, returned an indictment against the defendant in a second criminal case, United States v. David Roland Hinkson, Cr. No. 04-127-S-RCT, charging him with various offenses arising out of evidence that he solicited the murder of United

---

[1]Issues related solely to the tax case have been addressed by the assigned prosecutors from the United States Attorney's Office, District of Idaho.  Issues related solely to the solicitation case have been addressed by the assigned prosecutors from the Counter-Terrorism Section, Criminal Division.

States District Judge Edward J. Lodge, Internal Revenue Service Special Agent Steve Hines and Assistant United States Attorney Nancy Cook.

On June 24, 2004, the Supreme Court decided Blakely v. Washington, 124 S. Ct. 2531 (2004), holding that an upward departure imposed based on findings made by a judge, rather than by a jury beyond a reasonable doubt, under the Washington state sentencing guidelines violated the defendant's Sixth Amendment rights. On July 21, 2004, the Ninth Circuit decided in United States v. Ameline, 376 F.3d 967 (9th Cir. 2004), that Blakely applied to the federal sentencing guidelines, that the guidelines were not unconstitutional as a whole and that, other than the fact of a prior conviction, any sentencing enhancement that caused the guidelines calculation to increase beyond the base offense level had to be found by a jury beyond a reasonable doubt. On August 2, 2004, the Supreme Court granted the United States' petitions for certiorari in United States v. Booker, 2004 WL 1535858 (7th Cir. July 9, 2004), and United States v. Fanfan, No. 03-47-P-H (D. Me. June 28, 2004). The issues raised were whether Blakely applied to the United States Sentencing Guidelines, and, should Blakely be deemed applicable, whether its application meant that the Guidelines could not be used at all.

Based on the new charges and the Supreme Court sea-change affecting federal sentencing, the sentencing date in the tax case was vacated and the Court informed the parties that the sentencing hearing date in the tax case would be set following trial of the solicitation charges. On January 12, 2005, shortly after the solicitation trial began, the Supreme Court decided United States v. Booker, 125 S. Ct. 738 (2005), holding in Part I of its opinion that the federal sentencing guidelines scheme violated a defendant's Sixth Amendment rights where a sentence was enhanced beyond the base offense level based on facts found by the sentencing court on a less than beyond-a-reasonable-doubt standard. Rejecting the Ninth Circuit's approach in Ameline, a different majority of the Court in

3

Part II of its Booker opinion (the "remedial Booker opinion) held that the guidelines are severable and it excised those portions of the governing sentencing statute, 18 U.S.C. §§ 3553(b)(1) and 3742(e), that made the guidelines mandatory.  Booker, 125 S.Ct. at 756.  The remedial Booker opinion further stated that "the district courts while not bound to apply the Guidelines, must consult those guidelines and take them into account when sentencing." Id. at 767. The opinion further stated that appellate courts would review sentences for reasonableness.  Id. at 765.

On January 27, 2005, following a three-week trial, a second federal jury returned guilty verdicts against the defendant on three of the 11 solicitation-related counts pending against him. Sentencing is set for Monday, April 25, 2005, in both the tax case and the solicitation case.

LEGAL ARGUMENT

Federal sentencing law and procedure have changed and changed again during the pendency of these cases.  At the time that the tax case went to trial in April of 2004, federal sentencing was governed by the United States Sentencing Guidelines.  See 18 U.S.C. §3553(b)(2).  The Court was required to make factual findings at sentencing regarding all aspects of the guidelines, including enhancements and reductions from the base offense level.  The Court was permitted to make these factual findings by a preponderance of the evidence; however, in the Ninth Circuit, where a sentencing enhancement "has an extremely disproportionate effect on the sentence," that enhancement had to be shown by clear and convincing evidence.  United States v. Mezas de Jesus, 217 F.3d 638, 642 (9th Cir. 2000).

Approximately seven weeks after the jury returned its verdicts of guilty in the tax case, the Supreme Court decided Blakely.  On January 12, 2005, shortly after the solicitation trial began, the Supreme Court decided Booker.  Following Booker, the sentencing guidelines are no longer

4

mandatory.  Beyond that, based on the objections to the Presentence Investigation Report ("PSIR") filed by defense counsel, it is apparent that the parties are in considerable disagreement about the implication of <u>Booker</u> on the proceedings in this case.  The United States will: (1) set forth its position regarding the implication of <u>Booker</u> for federal sentencing proceedings; (2) respond to some of the specific objections set forth by the defendant; and (3) address the appropriate sentence in this case based on the now advisory sentencing guidelines and other factors set forth in 18 U.S.C. §3553(a).

A.     This Court Must Consider the Sentencing Guidelines in Imposing Sentence and May Make Factual Findings on a Preponderance of the Evidence Standard

The remedial <u>Booker</u> opinion made clear that the Court is not required to follow the United States Sentencing Guidelines.  To the contrary, any sentence imposed based on mandatory application of the guidelines, regardless of whether the factual findings were made by the judge by a preponderance of the evidence or by a jury beyond a reasonable doubt, would violate the rule announced in <u>Booker</u>.  <u>See</u> <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005).

Likewise, the remedial <u>Booker</u> opinion made clear that the Court <u>is</u> required to <u>consider</u> the United States Sentencing Guidelines, 18 U.S.C. §3553(a)(4),(5), along with the other purposes of sentencing set forth in 18 U.S.C. §3553(a).  <u>Booker</u>, 125 S.Ct. at 765-67; <u>see</u> 18 U.S.C. § 3553(a). Section 3553(a) directs sentencing courts to consider the seriousness, nature and circumstances of the offense; promote respect for the law; provide for just punishment; provide adequate deterrence; protect the public; and to consider the history and characteristics of the defendant, the kinds of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense.  18 U.S.C. §3553(a)(1)-(3),(6),(7).

Moreover, because the guidelines are no longer mandatory, in its discretionary consideration of the guidelines, the sentencing court may make factual findings in the same fashion it did prior to Blakely/Ameline, see Booker, 125 S. Ct. at 760-74, that is by a preponderance of the evidence or, where the guidelines enhancement "has an extremely disproportionate effect on the sentence," by clear and convincing evidence. Mezas de Jesus, 217 F.3d at 642. The remedial Booker majority carefully considered the Sixth Amendment required jury fact-finding beyond a reasonable doubt (the Ameline approach), and "flatly rejected any such remedy." United States v. Wilson, 355 F. Supp.2d 1269, 1272-73 (D.Utah Feb. 2, 2005). Rather, the remedial Booker opinion stated:

> To engraft the Court's constitutional requirement onto the sentencing statute would destroy the system. It would prevent a judge from relying upon a presentence report for factual information, relevant to sentencing, uncovered after the trial. In doing so, it would, even compared to pre-Guidelines sentencing, weaken the tie between a sentence and an offender's real conduct. It would thereby undermine the sentencing statute's basic aim of ensuring similar sentences for those who have committed similar crimes in similar ways.

Booker, 125 S.Ct. at 760. The remedial Booker opinion further noted:

> [t]he sentencing statutes, read to include the Court's Sixth Amendment requirement, would create a system far more complex than Congress could have intended. How would courts and counsel work with an indictment and a jury trial that involved not just whether a defendant robbed a bank but also how? Would the indictment have to allege, in addition to the elements of robbery, whether the defendant possessed a firearm, whether he brandished or discharged it, whether he threatened death, whether he caused bodily injury. . . . If so, how could a defendant mount a defense against some or all such specific claims should he also try simultaneously to maintain that the Government's evidence failed to place him at the scene of the crime? . . . How would a jury measure 'loss' in a securities fraud case–a matter so complex as to lead the Commission to instruct judges to make 'only . . . a reasonable estimate'?  § 2B1.1, comment., n. 3(C). How would the court take account, for punishment purposes, of a defendant's contemptuous behavior at trial–a matter that the Government could not have charged in the indictment? §3C1.1.

Booker, 125 S.Ct. at 761. In short, the remedial Booker opinion made clear that a court, in considering the sentencing guidelines, could make the appropriate factual findings as it had prior to

6

Blakely and that because the guidelines were no longer mandatory, enhancing factors need not be proven to a jury beyond a reasonable doubt. See Wilson, infra, (post-Booker guidelines factual findings made by judge based on preponderance of the evidence); Crosby, 397 F.3d 103 ("The Court in its Remedy Opinion contemplates that, with the mandatory use of the Guidelines excised, the traditional authority of a sentencing judge to find all facts relevant to sentencing will encounter no Sixth Amendment objection"); United States v. Juan Antonio Zavala, Cr. No. 02-0079-S-BLW, Sentencing Order, slip op. at 2 (D. Idaho January18, 2005)(post-Booker factual findings made on preponderance of the evidence standard except where enhancement has extremely disproportionate effect on sentence, must be made on clear and convincing evidence standard); United States v. Revock, 353 F.Supp.2d 127 (D. Me. January 28, 2005)( post-Booker factual findings made on preponderance of the evidence standard); United States v. Ranum, 353 F.Supp.2d 984 (E.D. Wis. Jan. 19, 2005)(resolving guidelines factual disputes as was done pre-Booker/Blakely); see also McReynolds v. United States, 397 F.3d 479 (7th Cir. 2005).

Despite the lengthy portion of the remedial Booker opinion explaining why the Sixth Amendment requirement could not be engrafted onto the sentencing statute, two district courts have apparently concluded that even in considering the guidelines, the sentencing court cannot impose enhancements that have not been found by a jury and proven beyond a reasonable doubt. See United States v. Huerta-Rodriguez, 2005 WL 318640 (D. Neb., Feb. 1, 2005); United States v. Barkley, Case No. 04-CR-119 (N.D. Okla. Jan. 24, 2005).   Defendant Hinkson, citing only Huerta-Rodriguez, also asks this Court to ignore the lengthy portion of the remedial Booker opinion explaining why the Sixth Amendment requirement could not be engrafted onto the sentencing statute and to reduce the sentencing guidelines range because various enhancements were not charged in

the pre-<u>Blakely</u> tax case indictment and were not proved to the jury beyond a reasonable doubt at the pre-<u>Blakely</u> trial of the tax case or the post-<u>Booker</u> trial of the solicitation case.

The defendant's interpretation of <u>Booker</u>'s impact on the sentencing in this case is contrary to the <u>Booker</u> remedial opinion and would, in fact, render it moot. Justice Breyer for the <u>Booker</u> remedial majority spent four pages explaining how unworkable a system that required prosecutors to allege sentencing guidelines enhancements in an indictment and prove them to a jury beyond a reasonable doubt would be. Rather, the better approach to federal sentencing factfinding after <u>Booker</u> is that adopted by the district courts in Utah, Idaho, Maine and Wisconsin, along with the Second and Seventh Circuits, as set forth above. Now, in light of <u>Booker</u>, the Court must consider the guidelines in an advisory capacity, along with the other factors set forth in 18 U.S.C. § 3553(a), make its own factual findings, which it can do by a preponderance of the evidence standard, and impose sentence. Thus, the failure to allege any sentencing guidelines enhancements in the indictment, or to prove them to a jury beyond a reasonable doubt, is not a relevant sentencing consideration.

B.    The Bulk of the Defendant's Objections are Without Merit, Have No Impact on The Sentencing Guidelines Calculation and Grossly Minimize the Defendant's Criminal Conduct

Along with generally objecting to the application of any enhancements not charged in the indictment or proven beyond a reasonable doubt to the jury, the defendant makes a number of objections to specific paragraphs of the PSIR. This Court heard detailed evidence in both the tax trial and the solicitation trial about the defendant's conduct over a number of years. Accordingly, the United States does not intend to respond to every single objection; however, the United States submits that the bulk of the defendant's objections lack merit, have no impact on the sentencing guidelines calculation and, most significantly, grossly minimize the defendant's criminal conduct.

1.    The Defendant's Objections to the Paragraphs Related to the Food, Drug and Cosmetic Act Charges Are Contrary to the Evidence and to the Defendant's Own Guilty Plea

In his objections to paragraphs 69 through 77 of the presentence investigaton report, the defendant attempts to characterize his criminal conduct that resulted in his guilty pleas to counts 17 and 26 of the indictment as inadvertent mislabelings that were caused by one of his employees, Jeri Gray. He otherwise contends that Water Oz was a legitimate business manufacturing dietary supplements that in no way ran afoul of any FDA regulations, if, in fact, such regulations applied. These arguments and objections are contrary to the evidence acquired during the course of the investigation and contrary to the defendant's admissions at his April 14, 2004, guilty plea before the Honorable Mikel H. Williams.

Although the defendant pled guilty to only a single count of delivering for introduction into interstate commerce a misbranded drug in connection with one specific bottle of Water Oz Lithium and only a single count of delivering for introduction into interstate commerce an adulterated device in connection with one specific Water Oz ozone generator, the evidence acquired during the course of the investigation made abundantly and overwhelmingly clear that the defendant's products were routinely mislabeled and adulterated. As the defendant himself knows and was clear from materials turned over to his attorneys in discovery, the Water Oz products met the FDCA's definitions of "drug" and medical "device," and both FDA and independent lab testing demonstrated that the Water Oz "drug" products routinely did not contain the amount of the principal ingredient represented on the label.[2] FDA testing established that the ozone generator likewise did not produce the amount of ozone Water Oz advertising purported; indeed, Hinkson's objections admit this as fact, but try to

---

[2]A summary chart prepared by FDA Special Agent Rob Blenkinsop showing various Water Oz product testing results is attached as Exhibit A.

blame the misbranding on instructions his employee, Jeri Gray, received in a mysterious telephone call from "one of [FDA's] representatives." Moreover, the conditions in which all of the Water Oz products were manufactured during the period of the investigation demonstrate that there was very little, if any, quality control and considerable opportunity for contamination. Photographs show dangerous and poisonous chemicals and questionable substances in the mixing and bottling areas. In short, the Water Oz products were not what the defendant told consumers they were.

In August of 2003, the United States filed a notice of intent to introduce other acts evidence under Federal Rule of Evidence 404(b), including evidence that in addition to the ten charged counts involving mislabeled and adulterated Water Oz products, all of which were obtained in an FDA undercover operation in January through April of 2002, testing on Water Oz products seized during the November 2002 search at the Water Oz plant showed that the products did not contain the amount of the principal ingredient represented on the label. See Docket no. 103. In its Notice, the United States wrote,

> As with the WaterOz products sent to FDA Special Agent Rob Blenkinsop in January of 2002, these products did not contain the amount of the principal ingredient set forth on the product label. In most cases, the product contained substantially less of the principal ingredient; however, in the case of WaterOz Silver, the product contained 280% of the amount of silver identified on the label.

The defendant, through prior counsel, objected to the introduction of this other acts evidence. In his September 26, 2003, order on the Rule 404(b) evidence and other issues, Judge Winmill agreed with the defendant, reasoning that because the FDCA charges were strict liabilty offenses, introduction of evidence to prove absence of mistake or accident would be irrelevant. He wrote, "[t]he Court will conditionally grant the Defendant's objection to introduction of the items seized in the post-indictment search under Rule 404(b), provided the Defendant does not assert a defense of mistake or accident."

Here, in his objections to the PSIR, the defendant seems to be asserting mistake or accident–albeit mistake or accident by someone other than himself–thus, the Court should consider the overwhelming evidence that the defendant's products did not contain what he said they contained in fashioning a reasonable sentence and in considering the defendant's post-FDCA plea assertions that his products are healthy and helpful.  Moreover, the Court should note that the defendant's sole basis for contending that his products were accurately labeled–save for the mistake or inadvertent acts of others that resulted in the mislabeling or adulteration in the counts to which he pled–is the product testing by Joe Swisher, the very person the defendant strenuously seeks to discredit in connection with his solicitation convictions.

The defendant also objects to characterizations in the PSIR of his WaterOz products as "drugs" subject to FDA regulation.  He continues to insist that his products were dietary supplements and that the FDA implicitly recognized this when it left his facility after he challenged the FDA inspector's authority.  These objections indicate a misunderstanding of the applicable law and are contrary to his admission of guilt in his April 14, 2004, plea hearing.  The plea agreement that the defendant signed and acknowledged during the plea hearing specifically identified the Water Oz lithium that was the subject of his guilty plea to Count 17 as a drug and the Water Oz ozone generator that was the subject of his guilty plea to Count 26 as a medical device.  It is the very character of these items as a "drug" and medical "device" under the FDCA that were elements of the charged offenses and subjected him to criminal liability.  As part of the routine Federal Rule of Procedure 11 colloquy that a Court must go through as to every guilty plea, both the defendant and his counsel have to acknowledge that there is an adequate legal and factual basis for the plea.  The defendant did so in this case, as did his counsel.  He is not challenging his plea.  Accordingly, because these objections to the characterization of his products as drugs or medical devices subject

11

to FDA regulation are contrary to his admissions in his plea agreement and plea hearing, these objections should be rejected.

Finally, the FDA in no way and at no time has conceded that it does not have regulatory authority over Water Oz products, and the aborted FDA inspection of the Water Oz facility on June 11, 1999, in no way suggests that the FDA was making such a concession. Rather, because the defendant's water products were marketed using information that described the products as being useful (and intended for) the diagnosis, cure, mitigation, treatment, or prevention of disease in man, they were "drugs" under the Food Drug and Cosmetic Act. 21 U.S.C. § 321(g)(1). In addition, because his ozone generator was intended to be used with an ozone suit to treat a number of medical conditions in man, including gangrene, it is a "device" under the Food, Drug and Cosmetic Act. 21 U.S.C. § 321(h).

The United States intends to call FDA Special Agent Rob Blenkinsop at the sentencing hearing to testify regarding the various aspects of the FDA investigation set forth in the PSIR and outlined in this sentencing memorandum. Although such evidence does not affect the guidelines calculation, it is relevant to the sentencing factors the Court must address under 18 U.S.C. §3553(a) and to the mitigating factors the defendant raises at pages 21 and 22 of his objections.

> 2.   The Evidence at the Tax Trial Supports Enhancements for Sophisticated Means, Obstruction of Justice, Structuring Amount and Proceeds for Unlawful Activity

The defendant specifically objects to five enhancements to the sentencing guidelines base offense level on the tax and structuring charges: (1) the two level enhancement for use of sophisticated means; (2) the two level enhancement for obstruction of justice; (3) the enhancement for amount of funds involved in the structuring; (4) the two level enhancement for structuring involving the proceeds of unlawful activity and (4) the enhancement for a tax loss amount beyond

the evidence introduced at trial.   Evidence introduced at trial supports the first four enhancements

and most of the tax loss calculated in the PSIR, and, as set forth in more detail in the following

section, the United States intends to introduce at the sentencing hearing sufficient evidence to prove

the relevant conduct tax loss set forth in the PSIR.  United States Sentencing Guideline 2T1.1(b)(2)

provides for a two-level increase if the offense involved sophisticated means.  Application note 4

to section 2T1.1 states, "'Sophisticated means' means especially complex or especially intricate

offense conduct pertaining to the execution or concealment of an offense.  Conduct such as hiding

assets or transactions, or both, through the use of fictitious entities, corporate shells or offshore

financial accounts ordinarily indicates sophisticated means."

As set forth in the PSIR at paragraphs 88-90, the defendant purported to transfer assets and

control of Water Oz to a variety of foreign and fictitious entities. He executed a number of quitclaim

deeds, and prepared or had prepared a number of documents showing that his relatives or long-time

employees were in charge of or had significant control over these foreign and fictitious entities.  At

trial, for example, the defendant's mother testified that although she was never involved in Water

Oz, she was the secretary for Compania Nortena de Terreno SA, although she didn't do anything for

that entity either.  Compania Nortena de Terreno was one of the foreign entities to which the Water

Oz land site was transferred for a period of time.   In addition, Jeri Gray testified that at the

defendant's request she signed documents for Compania Nortena de Terreno SA, a Belize

corporation, as its president and treasurer although she didn't know what it did.  When she was asked

about her duties as president of the company, she responded, "I didn't have any specific duties as

president of the company.  It was just more in name only."  These purported transfers of assets and

creation of fictitious entities sought to shield the defendants assets from lawsuits, creditors and

potential creditors, including the Internal Revenue Service.  Accordingly, the two level increase under U.S.S.G. § 2T1.1(b)(2) is appropriate and supported by evidence already before the Court.

Evidence introduced at trial also supports the two level enhancement for obstruction of justice.  U.S.S.G. § 3C1.1 provides that the obstruction enhancement applies if a defendant willfully obstructed, or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution or sentencing of the offense of conviction.  The record in this case is replete with the defendant's efforts to obstruct, impede or attempt to obstruct or impede the investigation and prosecution of the offense for which he has now been convicted.  As set forth in the PSIR at paragraphs 88-90, the defendant's attempts to conceal assets provide a basis for the obstruction enhancement as well as for the sophisticated means enhancement.  In addition, as set forth at paragraphs 84-86 and as the evidence introduced at the tax trial showed, the defendant engaged in efforts to obstruct the grand jury investigation by having a lawyer his company paid for by check, Milton Baxley, provide three Water Oz employees subpoenaed to appear before the grand jury with a basis for being excused from testifying–their refusal to take an oath based on religious convictions.  These same witnesses, Bruce Meinen, Jeri Gray and Grant Walton, had not refused to take oaths in other court proceedings.  Moreover, the evidence was unrefuted that the witnesses traveled to meet with Mr. Baxley and to the grand jury in the defendant's car, that the defendant knew about the grand jury subpoenas prior to the date of the requested testimony, that at least Mr. Meinen had a conversation with the defendant after his refusal to take the oath and that, according to Mr. Meinen's trial testimony, the defendant seemed relieved.  These facts support a finding, at least by a preponderance of the evidence, that the defendant conspired with his own lawyer to block any testimony by his employees in front of the grand jury investigating his illegal activities.

Finally, as set forth in paragraph 87 of the PSIR, in April of 2002, well after he was aware of the grand jury investigation, the defendant filed a federal civil lawsuit against Assistant United States Attorney Nancy Cook, IRS CID Agent Steve Hines, Revenue Agent Jerry Vernon and others, alleging misconduct in their investigation of him. This evidence, which the Court heard at various points in both the tax trial–primarily outside the presence of the jury--and solicitation trial, either alone or when considered in conjunction with the defendant's attempts to obstruct the grand jury investigation, also supports a finding by a preponderance of the evidence that the defendant obstructed the investigation and prosecution of the tax case.

Evidence introduced at the tax trial also supports the structuring enhancements. Although the jury did not make a finding that the specific amount involved was $135,000, the amounts alleged in the indictment and introduced at trial as evidence of the structuring totaled $135,000, which supports the base offense level of 16 as set forth at paragraph 129 of the PSIR. In addition, the defendant stipulated that $135,000 was subject to forfeiture in Count 43 based on the total amount involved in the structuring counts on which he was convicted and the Court entered a forfeiture order in that amount. Furthermore, the defendant knew that the funds involved in the structuring–cash withdrawn from the Water Oz business account, were the proceeds of unlawful activity or were derived from unlawful activity in that he knew the funds were: (1) Water Oz income on which he had not paid taxes; (2) Water Oz income he was going to use to pay wages from which no employment taxes were going to be withheld or paid over to the IRS; and (3) Water Oz income derived from mislabeled and adulterated products.

3.     The United States Will Introduce Evidence at the April 25, 2005, Sentencing Hearing Supporting the Relevant Conduct Tax Loss Amount as Set Forth at Paragraphs 78 and 82 of the Presentence Investigation Report

At trial, the United States presented evidence in support of counts one through three of the tax case indictment that the defendant had failed to file income tax returns for 1997, 1998, and 1999. Pursuant to Federal Rule of Evidence 404(b), the United States also introduced evidence that the defendant failed to file income tax returns for 2000 and 2001. Revenue Agent Jerry Vernon testified that he calculated the defendant's income for 1997, 1998 and 1999 using either the defendant's prepared but unsigned income tax returns or from analysis of bank deposits. He also testified that he deducted from those amounts the costs of goods sold and returns and allowances as set forth in the defendant's prepared but unsigned tax returns. Where a defendant fails to file an income tax return, the tax loss amount is calculated at twenty percent of gross income. The United States intends to call Agent Vernon at sentencing to briefly summarize this evidence as well as to testify regarding the defendant's income for 2000 and 2001 to ensure that there is an adequate evidentiary basis from which the Court can find that the full amount can be included in the sentencing guidelines' calculation of tax loss amount. Accordingly, the tax loss amount for the defendant's failure to file for both charged and uncharged years is $1,530,916.00, as set forth in paragraph 78 of the PSIR.

At trial, the United States introduced evidence in support of counts four through sixteen of the tax case indictment that the defendant had failed to account for, collect and pay over employment taxes from the fourth quarter of 1997 through to the fourth quarter of 2000. IRS Revenue Agent Nicoli Ferrell testified that the total amount of uncollected and unpaid employment taxes for that period was $880,374.61. The United States intends to call Agent Ferrell at the sentencing hearing to testify regarding her calculation of the uncollected and unpaid employment taxes for 2002 and

16

2003, thereby providing an evidentiary basis for the Court to find that the full amount of unpaid

employment taxes can be included in the sentencing guidelines calculation. Accordingly, the total

tax loss on unpaid employment taxes, as set forth at paragraph 82 of the PSIR is $2,002,024.48, and

the total tax loss, as set forth in the PSIR, is $3,531.940.48.

        4.     The Enhancements Under U.S.S.G. §§2A1.5(b)(1) and 2J1.7 are Appropriate Based on the Facts and Law

Defendant Hinkson objects to a two level increase under §2A1.5(b)(1) and to a three level

increase under §2J1.7 for each solicitation count of conviction. Section 2A1.5(b)(1) provides for

an increase where a defendant offers something of pecuniary value during the solicitation of a

murder. Defendant Hinkson denies that he ever offered anyone anything of value to undertake a

murder. This objection is without merit. His denials are contrary to the weight of the evidence and

to the jury's verdicts of guilty on Counts 7, 8 and 9. Witness Joe Swisher clearly testified that he

was offered $10,000 for each murder.

Section 2J1.7 provides for a three level increase where a defendant committed the offense

while on release. The Commentary to that section provides that the three level enhancement can be

imposed only after sufficient notice to the defendant by the government or the court. The defendant

objects on the ground that he was not given the requisite notice. This objection is likewise meritless.

The § 2J1.7 enhancement for an offense committed while on pretrial release is based on 18 U.S.C.

§ 3147, which "clearly and unambiguously mandates that the courts impose additional consecutive

sentences on persons convicted of crimes they commit while released on bond." United States v.

Kentz, 251 F.3d 835, 840 (9th Cir. 2001). Section 3147 does not itself include a notice provision

before its increased penalties can be applied. The Ninth Circuit, along with a majority of other

circuits, has determined that notice of increased penalties for offenses committed while on pretrial

release need not be included in the pretrial release order and that pre-sentence notice is sufficient. Id. at 840-41 (and cases cited therein). Thus, the Probation Officer's finding in the PSIR that this particular enhancement is appropriate constitutes the required pre-sentence notice. See id. at 840 (sufficient notice where government filed a pre-sentence notice of enhanced penalties, superseding indictment referred to §3147 and PSR included a §2J1.7 enhancement); United States v. Hecht, 212 F.3d 847 (3d Cir. 2000)(noting that test of §3147 and §2J1.7 are silent as to notice requirement and concluding that commentary to §2J1.7 requires only pre-sentence notice); United States v.Bozza, 132 F.3d 659, 661 (11th Cir. 1998)(§2J1.7 does not require notice prior to guilty plea); United States v. Vazquez, 113 F.3d 383, 388-89 (2d Cir. 1997)(noting that §2J1.7 suggests that only pre-sentence notice is required); United States v. Browning, 61 F.3d 752, 756-57 (10th Cir. 1995)(PSIR gave adequate notice for sentencing court to apply §2J1.7).

5. The Court Can Properly Consider Offense Conduct on Which the Jury Acquitted and on Which the Jury Hung

Although the PSIR's guidelines calculation does not include any enhancements based on evidence supporting the solicitation case counts on which the jury acquitted or could not reach a verdict, the defendant objects to the portions of the PSIR describing this evidence, paragraphs 91 and 105. This objection lacks merit. The Supreme Court has held that for sentencing purposes, even evidence applicable to counts that a jury acquitted on can be considered by the Court. United States v. Watts, 117 S.Ct. 633, 635 (1997)("a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.") The Supreme Court's Booker decision does not change this principle in any fashion. In fact, now that the sentencing court is directed by the Booker

remedial opinion to consider the factors set out in 18 U.S.C. §3553(a) along with the guidelines, this Court has even more discretion to consider this evidence in fashioning a reasonable sentence.

> 6.   The Defendant's Other Objections to the Description of His Offense Conduct And Pretrial Release Behavior Are Contrary to the Solicitation Case Evidence and Do Not Affect the Guidelines

The defendant makes a number of other objections to the PSIR's description of his pretrial release conduct, his conduct in the Ada County Jail and his conduct related to the solicitation charges. Although they have no affect on the sentencing guidelines calculation, because they may have an impact on the Court's crafting a reasonable sentence based on the guidelines and the §3553 factors, the United States will respond to some of them.

The defendant objects to paragraph 59's description of his obtaining a second passport in the late fall, early winter of 2002. This paragraph is accurate as written, and is not misleading. Defendant's suggested expansion of the paragraph is argumentative and one-sided. It seeks unfairly and inaccurately to blame the pretrial services officer for actions that defendant engaged in at his own volition that clearly violated the bond restriction that defendant was not permitted to apply for a new passport (which he admitted in his trial testimony that he did do). Defendant's suggested expansion should be rejected.

The defendant next objects to the descriptions in paragraphs 61 and 62 of his violation of Ada County Jail rules. These paragraphs are accurate as written. They are based upon written reports prepared by Ada County Jail correctional officers. The defendant's version of events is simply another example of the defendant trying to shift blame to others for his own behavior.

The defendant objects to paragraph 64 by denying that "he signed or cosigned an appearance bond for another inmate." Paragraph 64 does not state that he signed or cosigned an appearance bond for another inmate. Rather, the paragraph indicates that a bail bond company received

information that the defendant was going to co-sign a bond and that the company received faxed copies of bond agreement papers that contained a signature reading "David Hinkson."  The paragraph does not state that the defendant signed the papers, therefore, there is no need to amend the paragraph.

In his objections to paragraph 92, the defendant claims, in so many words, that the Probation Officer overstates the extent to which he, the defendant, acknowledged to government witness James C. Harding on tape on 3/27/2003 his past solicitations to murder the three federal officials.  The Probation Officer wrote in this paragraph that, " the defendant made statements acknowledging the prior offers to kill Judge Lodge, AUSA Cook, and SA Hines."  The government submits that the Probation Officer's above statement is a fair conclusion to be drawn from the nearly three hours of sometimes ambiguous, coded, and elliptical conversation between the defendant and Harding.  An example of the understanding that defendant and Harding had between them on this subject occurred at pg. 149 of the tape transcript (government's ex. 4a, solicitation case).  Afer much beating around the bush, the following was said:

> THE INFORMANT: I want to know something for sure. This is dead serious what I'm asking you this.  You talked to me about this on a couple of occasions.  Do you want to do it?  Do you not want to do it?
>
> MR HINKSON: What?
>
> THE INFORMANT: You know what I'm talking about. I can handle it.
>
> MR. HINKSON: What?
>
> THE INFORMANT: Your problem with three wiseman.
>
> MR HINKSON: I'm just suing them.

Again, at pg. 158:

THE INFORMANT: Well, after our many conversations I just wanted to make sure so I drove here. I couldn't talk to you about it on the phone. You said, hey, she hit me with this and I go, how many fucking people is he saying this to. How many people is he talking to. You can't say that shit.

MR. HINKSON: That's been my frustration. I keep telling you that. I had a guy, Steve Bernard, call up here. He's an office manager. And he says to me if you give me half of Water Oz I'm going to tell the feds that you hired a hit man to kill Dennis Albers. And you got this IRS agent with no proof at all in front of the grand jury saying that I'm head of two militias and I'm out whacking people. So I'm not going to whack people.

And at pg. 160:

MR HINKSON: But unless you got the videotape of me handing somebody money and saying, this is to kill Dennis Albers, you don't have any evidence.

THE INFORMANT: No you don't, you don't, but I mean, if you keep saying it, and you and I have had the conversation like I said a dozen times, you keep saying it - - me, it's cool, sweat off a ducks' ass.

MR. HINKSON: Oh, I get upset.

THE INFORMANT: Right, and that's fine.

MR. HINKSON: I was dragged out of the house, brutalized. I'm going to get even. You sense that, don't you?

And again at pg. 170:

THE INFORMANT: That's what I mean she hires some fucking dirt-bag Mexican to go whack Lodge or Hines or Hines or whatever the Hell his name is.

MR. HINKSON: I'm happy as long as she don't tie me to it.

THE INFORMANT: Well, that' what I'm saying.

MR. HINKSON: If you want to go do it, I don't want to know about it.

In all these instances it is apparent that defendant knew what Harding was referring to,

because he never challenged Harding about the references or even demanded any explanation, or

made any explicit denial.   The Probation Officer, therefore, was accurate in his portrayal of defendant's understanding.

The defendant objects to paragraphs 95 and 96 on the grounds that Special Agent William Long's testimony about the defendant's post-arrest statement is unreliable.   This Court has previously found in its Order denying the defendant's motion to suppress that SA Long's testimony is indeed reliable and credible on this subject.   No changes therefore, need to be made to these paragraphs.

Finally, the defendant objects to paragraph 99 by complaining about Joe Swisher's representations about his military background and making reference to his motion for a new trial. He does not appear to challenge the accuracy of the paragraph.   Accordingly, this paragraph should not be changed.[3]

7.    The Defendant is Not Entitled to Either a Variance from the Guidelines or A Downward Departure Based on Aberrant Conduct or His "Charitable Works"

At pages 21 and 22 of his "objections", the defendant argues that his sentence should be reduced under the guidelines or the §3553(a) factors because he did not commit his crimes until age 48, relatively late in life, and because he has engaged in exceptional community activities, charitable

---

[3]The defendant also objects to paragraphs 60 and 94.   The United States agrees that paragraph 60 contains the incorrect date for his arrest for violating the terms and conditions of his pretrial release.   He was arrested on April 4, 2003, not April 6.   As to paragraph 94, the Defendant proffers here a detailed recitation of his activities in Mexico with his employee, Marianna Raff.   The government has maintained the position throughout the solicitation prosecution that defendant's relationship with and activities involving Raff are irrelevant and immaterial to any issue in this case.   The government has no objection, therefore, to eliminating from this paragraph all references to Raff, and events in Mexico.

22

services and good works, including being the largest private employer in Idaho County, providing

free WaterOz products to the poor and needy and working at tuberculosis and cancer clinics.[4]

No such variances or downward departures are warranted in this case. In arguing that he has

lived a crime-free life until a relatively late stage of his life, the defendant ignores that his criminal

conduct spanned a period of at least six years and that his post-arrest conduct has demonstrated little

to suggest that his criminal activity has ceased or that his conduct was aberrant. In addition, aside

from his own self-serving testimony, the United States is unaware of any evidence suggesting that

the defendant worked at children's medical clinics. His mother's testimony at the tax trial suggested

that he traveled internationally extensively because he was looking to expand his business.

Approximately the first third of the taped conversation between James Harding and the defendant

contains a number of references to the defendant's international travel for other-than humanitarian

purposes.

Moreover, while WaterOz may have been the largest private employer in Idaho County

during the period charged in the indictments against him, it was hardly a legitimate business. As the

evidence in the tax case made clear, Water Oz routinely sidestepped federal tax laws, facilitated

some employees' non-payment of income taxes, and was a haven for persons hiding their identity

for a variety of reasons. A number of employees testified that they were paid in cash, and at least

three employees–Annette Hasalone, Steve Bernard and Chris Jon Peytriot–acknowledged that they

were not using their full true names for at least a period of their Water Oz employment. As set forth

above, there also is considerable evidence that, during the period charged in the tax indictment, the

---

[4]The defendant also contends that he is entitled to some sort of downward departure based on prosecutorial misconduct related to Joe Swisher's military records. The United States has responded to allegations of prosecutorial misconduct throughout these proceedings and does not intend to further address the issue here.

Water Oz products were not the miracle drugs he represented them to be. They were misbranded and adulterated drugs and devices–contraband under the law. Assuming Hinkson actually did provide these drugs to the poor free of charge, asking for a downward departure for such activity is little different than a defendant in a controlled substances case asking for a downward departure because she gave free cocaine to poor customers. Accordingly, the defendant is not entitled to either a downward departure or variance from the guidelines based on his "good works".

C. A Sentence at the High End of the Guidelines Range is Reasonable and Meets the Statutory Sentencing Purposes Set Forth at 18 U.S.C. § 3553(a).

Recognizing that the United States Sentencing Guidelines are only advisory, the United States asks this Court to give great weight to the advisory guidelines range and to impose at the high end of the applicable guidelines range, which is both reasonable and meets the statutory sentencing purposes set forth at 18 U.S.C. § 3553(a). The initial PSIR has set a guidelines range of 78-97 months on the charges from the tax case and a guidelines range of 324 to 405 months on the charges from the solicitation case. The United States, through counsel in Cr. No. 04-127-S-RCT, has requested an additional two level increase based on the defendant's additional acts of obstruction immediately prior to the solicitation trial. Although the United States will not make a specific recommendation until the April 25, 2005, hearing, the United States' recommendation will be at the high end of the guidelines applicable to each case. A summary of the reasons for that recommendation, with additional argument to be made at sentencing, is set forth below.

1. Seriousness of, Nature and Circumstances of Offense

The offense conduct factors weigh heavily in favor of a lengthy sentence and strongly supports the United States' recommendation for a lengthy sentence. The defendant's criminal conduct has been increasingly serious and aggressive. What started as routine tax and FDCA crimes,

turned to threats and solicitation of the murder of those who investigated and prosecuted him, as well as threats and solicitation of the murder of the federal judge assigned to hear his case.  In an environment of increasing hostility–and violence–toward judges who make what are, to some, unpopular decisions, fewer crimes can be considered more serious.  The defendant has reflected increasing animus toward any form of federal government regulation, from enforcement of the tax, bank reporting and FDA laws to the authority of the federal courts to follow laws and procedure established to adjudicate federal criminal charges.  The defendant's criminal conduct has not stopped with his arrest, detention or tax crime convictions.  Rather, he has demonstrated through his solicitation of fellow inmates in the Ada County Jail to murder those who have crossed him that little can be done to end his efforts to exact revenge.

### 2.   Promote respect for the law

The need to promote respect for the law also weighs heavily in favor of lengthy sentence. The defendant's conduct throughout these proceedings shows that he has virtually no respect for the law. His crimes were directed first at the government agencies that purported to regulate him, then focused on those who sought to enforce the law.  He has demonstrated his disrespect for the law, including the courts, throughout his period of pretrial detention and post-conviction detention in the Ada County Jail. He manipulated Ada County Jail personnel into allowing him to make virtually unfettered, unrecorded telephone calls by claiming several telephone numbers as attorney telephone numbers when, in fact, they were not.  He circumvented and attempted to circumvent the jail rules.

### 3.   Provide Just Punishment/Treat Similarly Situated Defendants Similarly

The need to provide just punishment also weighs in favor of a lengthy sentence.  Just punishment is punishment that is not only fair to the individual defendant but also to society and to other defendants charged with the same offense, the goal embodied in Sentencing Reform Act of

1984 that similarly situated offenders receive similar sentences. The defendant's conduct is the most extreme of any tax case in the District of Idaho. Although the tax loss amount is not the highest, the criminal conduct that accompanied and followed the defendant's willful failure to file income tax returns and his willful failure to account for, collect and pay over employment taxes was extreme and unjustified by any government action. Accordingly, his punishment should be at the high end of the applicable guidelines range.

This defendant's conduct in the solicitation case is markedly similar to that of Matthew Hale, who was convicted of soliciting the murder of United States District Court Judge Judith Lefkow and sentenced to 40 years imprisonment. Accordingly, this defendant's sentence should be, at least, in the range meted out to defendant Hale.

### 4. Provide adequate deterrence

The need to provide adequate deterrence, both specific and general, also weighs in favor of a lengthy sentence. Based on the defendant's continuous delaying and obstructive conduct, his continued lack of candor with the court and his flaunting of court and jail rules, only a lengthy sentence can in any way begin to impress on him the wrongfulness of his conduct. Likewise, a lengthy sentence will deter other white collar criminals who intentionally defy government regulations and the obligation of every citizen to file income tax returns from attempting to obstruct and threaten those investigating and prosecuting them.

### 5. Protect the public

The need to protect the public also weighs heavily in favor of a significant sentence. The defendant's conduct throughout these proceedings, including additional efforts to solicit murder from Chad Croner only a month before the solicitation trial and the use of his credit card number to bond

a person out of the Ada County Jail, suggests that the defendant demonstrates no remorse and has only intensified his criminal conduct. The public can only be protected through a lengthy sentence.

### 6.    History and characteristics of the defendant

The defendant's history and characteristics also weigh in favor of a significant sentence. Although the defendant has no prior criminal convictions, seems to have a supportive family and has been steadily employed–all factors that might ordinarily mitigate against a lengthy term of imprisonment–his history and characteristics of obstructive and deceptive behavior weigh in favor of a significant sentence. In addition, the trial evidence demonstrated that the defendant maintained nominee ownership and concealed assets through the assistance of family members, and that many of those same family members who support him are benefitting from the continued existence of his company. In these circumstances, the defendant's personal history and characteristics support the government's recommendation for a lengthy sentence.

### 7.    Availability of/Need for Rehabilitation Options

The availability of and need for rehabilitation options weigh neither for nor against a significant sentence, and certainly do not warrant a variance from the advisory guidelines range. The defendant has significant educational and vocational skills, and it is not his inability to earn a living, or any sort of addiction, that produced his criminal conduct. In addition, the defendant's complete lack of remorse, blame-shifting and minimization of his criminal conduct strongly suggests that he is not amenable to rehabilitation.

### 8.    Need for Restitution to the Victim

The need for restitution to the victim likewise weighs neither for nor against a significant sentence, and does not warrant a variance from the advisory guidelines range. Although the defendant has a significant outstanding tax liability, the defendant's conduct in no way suggests that

he would be amenable to voluntarily settling that debt. Rather, it is likely that following the proceedings in this case, the Internal Revenue Service will have to take steps through its civil side to collect the more than $3 million in unpaid taxes.

CONCLUSION

For the reasons set forth above, the United States respectfully requests that this Court adopt the findings of the PSIR, plus the two level increase requested by the United States based on the defendant's November and December 2004 obstructive conduct, deny the defendant's objections to the sentencing guidelines calculation, deny any defense requests for downward departures and sentence the defendant at the high end of the applicable guidelines range.

DATED this 15th day of April, 2005.

THOMAS E. MOSS
United States Attorney


Wendy J. Olson
Assistant United States Attorney


Thomas Bradley, Special
Assistant United States Attorney


BARRY M. SABIN
Acting United States Attorney


Michael P. Sullivan, Special
Assistant United States Attorney


Michael D. Taxay. Special
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I CERTIFY that I am an employee of the United States Attorney's Office, and that a copy

of the foregoing Government's Sentencing Memorandum was served on all parties named below this

15th day of April, 2005.

_____ United States Mail, postage prepaid

_____ Hand delivery

_____ Facsimile Transmission (fax)

_____ Federal Express

_x_ ECF Filing

Wesley W. Hoyt
Attorney at Law
HC 66, Box 313A
Kooskia, Idaho 83539

Hon. Richard C. Tallman
Ninth Circuit Judge
U.S. Courthouse, Room 902
1010 Fifth Avenue
Seattle, Washington 98104

_____
Wendy J. Olson

# SUMMARY OF WATER OZ LABORATORY RESULTS

(All in ppm)

| WATER OZ PRODUCT | Label/Web site Claim | Western Analysis Inc.[1] | Northwest Analytical, Inc.[2] | State of Idaho, Dept. of Health and Welfare[3] | FDA FCC U/C Purchase[4] | FDA FCC Search Warrant[5] |
|---|---|---|---|---|---|---|
| Boron | 30+/- | 35 | 35 | 16.5 | 44 | 78 |
| Calcium | 2500+/- | | 2505 | 671 | 720 | 610 |
| Chromium | 300+/- | 28.5 | 325 | 88.6 | | 48 |
| Cobalt | 200/100+/-[?s] | | 261 | 100 | 44 | 81 |
| Copper | 90+/- | 57.4 | 133 | 40.9 | | 92 |
| Germanium | 50+/- | 26.5 | 71 | | | 24 |
| Gold | 50+/- | 23.7 | 130 | | | 40 |
| Iodine | 15+/- | | 24 | | | .033 |
| Iron | 75+/- | 42.9 | 89 | <0.01 | | 3.5 |
| Lithium | 30+/- | | 44 | | 2.5 | 5.8 |
| Magnesium | 2500+/- | 199 | 2300 | 386 | | 620 |
| Manganese | 100+/- | 254 | 143 | 30.5 | | 33 |
| Molybdenum | 50+/- | | 77 | 10.2 | 6.2 | 6.5 |
| Platinum | 50+/- | 33.8 | 79 | | | 61 |
| Potassium | 700+/- | 499 | 1023 | 175 | 360 | 420 |
| Selenium | 75+/- | 151 | 135 | 46.7 | 26 | 22 |
| Silver | 100+/- | 83.9 | 230 | 164 | | 280 |
| Sulfur | 700+/- | 95.4 | 1109 | | | 250 |
| Tin | 100+/- | | 142 | 7.4 | 3.9 | 2.1 |
| Vanadium | 100+/- | | 371 | 30 | | 27 |
| Water of Life | "approx. 84 trace elements" | | "Prioritary" (sic) | | 750 Ca; 160 Mg; 9.3 Zn; 1.3 Na | |
| Zinc | 300+/- | 124 | 354 | 140 | | 170 |
| EPN | | | | | | |

1.  Lab results performed by Western Analysis, Inc., 40 West Conice Ave., Salt Lake City, UT. Items were submitted by WATER OZ. Testing was conducted on July 10, 1998 (chromium, copper, gold, magnesium, platinum, selenium, silver, sulfur, vancromzin, and zinc) and on 1/29/99 (manganese, potassium, iron, germanium).

2.  Laboratory analysis performed by Joe Swisher of Northwest Analytical, Inc., Route 1, Box 166, Cottonwood, Idaho. Date of analysis is listed as March 19, 2001. Samples were listed as being supplied by WATER OZ.

3.  Laboratory analysis conducted by the State of Idaho, Department of Health and Welfare, Bureau of Laboratories-Boise Laboratory. Tests were conducted between 5/9/01 and 5/15/01. The samples were provided by WATER OZ at the demand of the Idaho Attorney General.

4.  Laboratory analysis conducted by the FDA Forensic Chemistry Center (FCC), 6751 Steger Drive, Cincinnati, OH. Products were purchased from WATER OZ on January 22, 2002.

5.  Laboratory analysis conducted by the FDA FCC on WATER OZ products seized pursuant to search warrant on November 21, 2002.

6.  The label lists 200 +/- ppm, while the WATER OZ web site listed Cobalt as containing 100 +/-ppm.